Your Honors, good morning. Gary Burcham on behalf of Appellant Mr. De Nier. Mr. De Nier was denied a fair trial in this case because of evidentiary errors committed by the district court and by a terribly improper cross-examination by the government. I'd like to start with the cross-examination issue. It's the second issue in my brief. At the conclusion of Mr. De Nier's direct testimony, and he was the last witness at trial, he testified as to why he did not voluntarily return to the U.S. once the indictment against him was returned. And what he testified to was that he was scared to come back because in a conversation that he had had with one of the prosecutors and a case agent, the prosecutor had threatened to revoke his U.S. citizenship. In the cross-examination, the government addressed this. The government wanted to deal with this testimony. But instead of the government, as the case law of this court and common sense requires, instead of the government calling the case agent to testify as to what was said in that interview, the prosecutor became his own witness against Mr. De Nier. There essentially are three questions or statements that are part of the improper line of cross-examination. This is on ER pages 71 and 72. The first question from the prosecutor was, do you know, he said to Mr. De Nier, do you know it is a lie to say that I said I was going to revoke your citizenship? There was a general objection by defense counsel. It was overruled. And Mr. De Nier was forced to answer that question. There's really two problems with that first question. Number one, it's vouching because he's talking about himself as the basis for the question. And number two, it's forcing Mr. De Nier to call him a liar. U.S. v. Sanchez talks about that. And that's the unmistakable conclusion from the first question and the answer. The second question was not even a question. It was just simply testimony. The prosecutor said, I never said to you anything about revoking your citizenship. Now this objection was sustained by the district court and the testimony or question or whatever it was was stricken. But the problem with this second statement, that's really not something that, that's not a bell you can unring. This is the prosecutor in this case who had been the prosecutor, the lead prosecutor for I think four or five days of trial by now, literally telling the jury in his cross-examination his position as to this issue. And so even though this was, this objection was sustained, even though the question was stricken, this was a terribly prejudicial statement by the prosecutor that I don't think the jury was probably able to get past despite the district court's instruction. The third question is similar to the first one. It has the same problems. The hearsay objection was overruled and Mr. De Nier again was forced to call the prosecutor a liar and the prosecutor was vouching with his question in the very first place. The government takes the position on appeal that there was actually no error and certainly no harmful error. As to the first and second questions, the prosecutor says these were appropriate questions from the prosecutor to allow Mr. De Nier a chance to correct his false testimony. That's not what the case law of this court says. Ron Held Guzman is crystal clear that when you have this sort of dispute between a prosecutor who was present at a proceeding or at a meeting or a phone call or whatever it is, and a defendant, that you need to call that third person to address the dispute. In this case, even though the case agent was sitting right next to the prosecutor and presumably could have been called in rebuttal with two questions. Were you there during the phone call? Did the prosecutor threaten to revoke his citizenship? Instead of calling the agent and asking those two questions, we went down this road of vouching, forcing Mr. De Nier to call the prosecutor a liar and the prosecutor calling Mr. De Nier a liar. And the reason why this is harmful in this case is because of the nature of the defense and the nature of this error. This case rose and fell on the testimony of Mr. De Nier. The government introduced evidence from employees from Powerline. It introduced evidence from Mr. De Nier's wife. It had emails it introduced. And Mr. De Nier testified at length and direct and cross about these pieces of evidence. And he testified that he didn't know specifically what his wife was doing with these contracts and didn't know she was substituting the batteries. And so given the nature of the case and given Mr. De Nier's defense, which rested almost entirely in his own testimony, his credibility was central to this case. And when the prosecutor went down this road and personally vouched for the fact that Mr. De Nier was lying about that issue and personally attacked his credibility, that was extraordinarily damaging to Mr. De Nier and went straight to the heart of his defense. As to the district court's errors, we raised two in our brief. The first one concerns the district court's refusal to allow Mr. De Nier to testify on direct that he did not make a statement during his interview with Special Agent Settle. I think probably the government's strongest evidence in this case was the testimony of Agent Settle when he described what Mr. De Nier had said during his interview in July 2011. And what he essentially said was that Mr. De Nier had admitted knowledge of these contracts and knowledge of the specifics of these contracts. And in his direct testimony, Mr. De Nier wanted to counter this, not by contesting bits and pieces of his statements, but he simply wanted to testify that I never made the statements to Agent Settle that he said that I made. The objection was on hearsay. The district court sustained that objection. But this didn't create a hearsay problem at all. All Mr. De Nier wanted to testify to was that he did not make a statement. So there was no out-of-statement being offered by the defense? But by simply saying, I never made those statements in the first place. So that's the first error by the district court. And it was an email that talked about the world's most dangerous book, and it was a book used by international crime syndicates, and it dealt with all these criminal issues. And the government tried to bring this in, and the lawyer said this has nothing to do with this case. And the district court allowed it in. And it's true, the government didn't argue this in its closing, but this was a terribly inflammatory exhibit. There was no allegation that Mr. De Nier did any of the things that were talked about in this book. The government even concedes that they're not even sure if he was serious when he forwarded this spam email to his wife. Yet this is something that comes in to paint Mr. De Nier as someone who's likely to commit crimes. It was propensity evidence. And so that was a third error in this case. We think that any error by itself is sufficient to reverse in this case. We have two constitutional errors. We have a terribly prejudicial third error. We think any of those errors by itself is sufficient to reverse, given that Mr. De Nier testified, given that Mr. De Nier presented a viable defense to the charges. If the court isn't of the opinion that any one error is sufficient, we'd ask the court to look at them together, cumulatively. And we think that based upon the nature of the errors, that based upon the fact that the errors went directly to his defense and directly to his credibility, very unfairly so, we would submit that the errors considered together certainly require reversal if any one error does not by itself. Do you want to save the rest of your time for rebuttal? Yes, sir. Thank you. May it please the Court. Ryan Weinstein on behalf of the United States. Counsel, let me ask you first. You didn't try this case, did you? I did. Myself and another AUSA tried the case, Your Honor. And are you the counsel who objected on the grounds of hearsay? My name appears in the transcript. It was actually my trial partner who raised that particular objection. And were you the counsel who said, in effect, had to dispute over whether you were a liar or the defendant was a liar? That was not me, Your Honor. It was my co-counsel. Okay. Thank you. So, Your Honors, the defendant in this case was convicted after a six-day jury trial in which the jurors heard from over 19 different witnesses, saw over 250 exhibits. And as a result of all that evidence, the jury convicted the defendant of a seven-year scheme to rip off the military by providing counterfeit knockoff batteries that Navy personnel unwittingly installed onto Naval battleships, including mission-critical systems aboard those battleships. Are you planning on defending the ruling that this was hearsay when he was not allowed to say he had not made the statement? I'll say only this, Your Honor. The questions, at least as phrased, appear to invite Ortega's statements, which, of course, would be indemnifiable hearsay. That said, of course, Your Honor, there are – there's ample reason why the Court's ruling was – didn't constitute harmless error in this case. Well, it did or did not constitute harmless error? It did – I'm sorry. It did constitute harmless error. There was no harmful error. And there's at least four reasons for that. Before you get to that, are you – I'm not quite sure if you answered my question. Do you acknowledge that it was error to prohibit the defendant from saying that he did not make that statement? Respectfully, no, Your Honor. I don't think the Court abused its discretion because the question to the defendant, at least as phrased, appeared to invite a response that included Ortega's statements. In other words, indemnifiable hearsay about false exculpatory is given during the interview. One of the phrasings of the question was, did you tell Agent Settle so-and-so? The response quite easily could have been, no, I told him X, Y, and Z, and all of that would have been indemnifiable hearsay. It could have been, well, today is Wednesday. It could have been anything, I suppose. Certainly. But he was asked whether he denied making that statement. The statement, in effect, was a confession. And he was asked, did you make that statement? Otherwise, it was unrefuted that he had, in effect, confessed. I acknowledge, Your Honor, if the question had been yes or no, did you tell Agent Settle that you knew about the contracts, then there would have been no legitimate hearsay objection. But the question, as phrased, appeared to call for more, Your Honor. What was the question? Did you tell Agent Settle that you knew about the contracts? And that calls for more than a yes-or-no answer? It certainly could, Your Honor. And based on the defendant's answers to the questions up until that point in the hearing, there was certainly no legitimate expectation. You know, occasionally it would be nice if somebody came in from the government and said, you know, we made a mistake. Wouldn't that be nice? Yes, Your Honor. Yes or no? Yes. The answer is yes. In any event, Your Honor, the Court's ruling on the hearsay objection was harmless error for at least four reasons. First, the defendant was able to testify over and over and over again about the substance of the hearsay he claims wasn't properly excluded, i.e., that the defendant knew nothing about the hundreds of contracts his company had entered into over the course of seven years, knew nothing about the $2.7 million flowing from the Department of Defense into his account. And not only that, Your Honor, the fact that the defendant initially denied to the case agent knowing anything about those contracts was already before the jury. The government elicited that testimony from the case agent while the case agent was on direct examination. The case agent explained that initially the defendant said, no, I don't know anything about these 80,000 batteries that my company apparently shipped to the government. It was only after the defendant was confronted with the evidence against him and told that his ex-wife and co-conspirator had confessed that his story began to change. This is at Government's Excerpt 212. It was then and only then that the defendant admitted, well, our company doesn't have a halo over our head. It was then and only then the defendant had specific recollection about batteries that he and his company shipped to the government that didn't meet military specifications. For example, certain batteries weren't designed to withstand high temperature environments, even though that's exactly what the contracts he entered into with the government called for. And his only explanation to this was, well, you know, the knockoffs weren't good enough for the government. So in other words, this same pattern, same pattern that occurred in the pretrial interview, took place right before the jury. The defendant on direct examination issued blanket denial after blanket denial. I have no idea what was going on at my company because I was floating aboard my yacht in the Caribbean. Then on cross-examination, the prosecutor confronts him with the evidence against him, including invoices with his handwriting on them, including e-mails that he exchanged with his ex-wife about how to respond to questions being raised from the Defense Logistics Agency about why he was receiving these batteries that didn't appear to be authentic. So in other words, Your Honor, notwithstanding the ruling on the hearsay objection, all of the evidence was before the jury. All the evidence the jury needed to make a well-informed decision, adjudication of the defendant's guilt or innocence, was placed before them. Third, Your Honor, another reason why any error here was harmless is because the defendant had a full and fair opportunity to cross-examine Agent Settle on the subject matter of his testimony, specifically on the pretrial interview. The defendant quite effectively impeached the case agent because there might have been language issues. The defendant was a native French speaker because the case agent didn't record the interview, because the defendant may have been intimidated at the time because the interview was conducted concurrent with the search of the defendant's business. And the unmistakable inference that the defense was seeking to offer here was that what Agent Settle said about the interview wasn't true. Given the defendant's over and over again denying knowing anything about what happened at his company, combined with the impeachment of Agent Settle, it was clear what the defendant's point was to the jury. The defendant's point was to the jury, and that's that nothing about Agent Settle's testimony about the pretrial interview was to be believed. And finally — Do you know that the most damaging evidence possible against a defendant is a confession? Your Honor, here that was — that is damaging evidence. But here, Your Honor, there was so much other evidence of the defendant's guilt that the — yet one more blanket denial from the defendant in the context of a pretrial interview would have mattered little to the jury's determination. It's a denial. It's a denial of having made a confession. And the confession was, yes, I knew about these batteries. The implication is I knew nothing about what was going on in my company. However we want to characterize it, the testimony that the defendant claims was improperly excluded would have mattered little in the context of all the evidence that was introduced. And that includes testimony from nearly every one of the defendant's employees who testified that it was the defendant that taught them how to assemble those batteries. It was the defendant who prepared written instructions on how to put together the knockoff batteries. It was the defendant who actually told his employees where to place counterfeit labels on the batteries so the government wouldn't know that, in fact, there were knockoffs. There was testimony from several witnesses that the defendant was the one that told them where to use chemicals and lacquer thinner and spray paint to remove made-in-China markings that would have given away the fact that these batteries weren't the batteries called for by the contracts. There was testimony from another employee that the defendant directed her to fax a doctored invoice to the Defense Logistics Agency as proof that he... Do you want to defend the alleged error against the alleged error that counsel started with? Yes, Your Honor. So, admittedly, these three questions were ill-advised. And the government has conceded that at least the second question, which certainly ventured too close to the declarative, was improper. That said, this is not a case that falls squarely, at least, within Rongel Guzman for various reasons, including the fact that it was the defendant who introduced the out-of-court statement of the prosecutor instead of the other way around. Also, the fact that the government did call the case agent to testify about the pretrial interview, and then it was the defendant that took the stand and invented a separate meeting, untethered to any place or time, and certainly making no mention of any other witnesses. That said, Your Honor, the bottom line here, again, is there was no prejudice, and that's for at least three reasons. First, this was one line. This was pure throwaway testimony that had absolutely no relevance to the defendant's guilt or innocence in this case. It didn't merit a single follow-up question from defense counsel. It didn't mention a single mention by defense counsel at closing arguments. In fact, it was never mentioned at the trial again. And second, Your Honor, this simply was not a close case in which a handful of questions on cross-examination could have turned the tide. And that's because of the volume of evidence. Again, I went over the testimony from all the employees at the company, but that testimony was also corroborated by documents. The jury saw e-mails, again, between the defendant and his wife talking about how to throw the defense logistics auditors off the trail and convince them what they were receiving were authentic batteries. The search of the defendant's business found invoices for a single genuine battery all the while the defendant and his company claimed to be shipping hundreds of thousands of these genuine batteries to the government. Consistent with the testimony of the employees, the jury saw the invoices that were doctored with the whiteout, the paper overlays, all to make it look like what the defendant and his company were doing were ordering the genuine batteries from companies like Motorola when, in fact, all they were doing was ordering one  The jury saw military battery orders with defendants' handwriting all over them. Juries even saw a video of defendants handling battery shipments that were bound for an aircraft carrier in San Diego, the very shipments he claimed to know nothing about. So the defense counsel suggested, well, my client had a defense, but the defense really boiled down to, I knew nothing about the hundreds of battery contracts my company went into. I was just floating on my yacht for seven years. And the fact is that defense fell completely apart. It disintegrated on cross-examination of the defendant, where he was forced to admit that, yes, I knew my company was doing business with the government. Yes, I was regularly apprised of the payment on those invoices. Yes, of course, I knew all of that. So there really was nothing left. And finally, Your Honor, another reason why the misconduct here was harmless is because the district court instructed the jury both before and after the trial that the questions from the lawyers, of course, are not evidence, and specifically instructed the jury that anything stricken should be ignored, and so advised the jury at the end of trial. Unless there are more questions about that particular issue, I'll turn to Trial Exhibit 703. So this was an email sent by the defendant to his primary co-conspirator, his ex-wife, at the outset of the scheme. It was forwarding a solicitation for a book that promised to teach readers, among other things, how to escape offshore. And the evidence showed that that is precisely what the defendant ultimately did after his business was searched, after he was presented with a search warrant affidavit implicating him in the criminal scheme with which he was charged. Three months later, he sold his house and went to live aboard his yacht on the French side of the Caribbean island of St. Martin, where he could not be extradited. That was not all that was introduced into evidence. That could have been isolated and shown to the jury. What was shown was an entire, I think, couple of pages of how to commit crimes. That's true, Your Honor. The 403 objection was not raised until appeal. The objections raised in district court were relevance, authenticity, and hearsay. And I suspect that if the government tried to introduce a redacted version of that email, we'd receive an argument from defense counsel that we're misleading the jury, that this book wasn't just about escaping offshore, but dozens of other things that really had no relevance to the case. But the fact that the defendant may have found this humorous is relevant. It actually supported the government's theory. It was sent at a time when the defendant and his wife were already planning the scheme, had already entered into contracts with the government, and had already made plans to purchase this yacht, the same yacht that the defendant would eventually flee aboard. So it was the ironic timing of receiving this spam email that the defendant, by his own admission, found humorous, found amusing. This is not an email that was amusing or humorous on its face. It was the timing of the email just as the defendant and his primary co-conspirator embarked on the scheme that made it so amusing to the defendant that he forwarded it right on to his ex-wife with whom he was plotting the scheme. Thank you, counsel. Thank you, Your Honor. Counsel, I suggest you concentrate particularly on the question of harmless error. I understand, Your Honor. You know, the government says the evidence was so overwhelming that the other witnesses testified, emails were out there. If the evidence is so overwhelming in a case like this, then why is the government doing these things? If the evidence is so overwhelming. That's an unanswerable question. But aside from that, is the evidence not overwhelming? And why is it not overwhelming? Well, it's not overwhelming, number one, because Mr. Dinier addressed all the points that were raised by the government. Yes, the government scored points. In this case, the government scored points with its testimony from the power line witnesses. The government scored some points with some of the exhibits it introduced. And the government scored huge points with Agent Settle's testimony that Mr. Dinier could not respond to. But the reason why it's not harmless in this case is because Mr. Dinier specifically addressed these points in his testimony. Mr. Dinier didn't just take the stand and gloss over these issues that the government had raised. He specifically dealt with these issues. He explained why these issues were not, as the government said. And he gave a viable defense as to why he did not know what was happening. And so the government ticks off all these things that it introduced. But I'd ask the court to go back and look at Mr. Dinier's direct and cross. In direct, he said he didn't know. And on cross, 78 pages, 75 of it was permissible. And the government hit him very hard with these points, with emails, with statements from witnesses. And he gave a plausible account as to why he didn't know, for instance, with respect to training people to make the batteries. He said he did that just for general commercial purposes and not specifically for military contracts. In terms of the folders on how to design batteries, again, he said he did that for general commercial purposes and not specifically for any military contracts. And so pages 11 through 14 of my reply brief, I specifically go through each of the points raised by the government in its answering brief, and I specifically point to the place in the record where Mr. Dinier addressed the issue and explained why it wasn't, as the government said. And so the record, I don't have to argue it here, it's in the record as to why this is not harmless and as to why Mr. Dinier gave a plausible account. You don't have to, but I think it would be helpful if you argued. That really would appear to be the issue, I think, as you could tell from the length of time the government spent on that issue. Well, again, as to how to assemble batteries, he said he showed them that for commercial purposes. In terms of the labels, he said he made a label initially for commercial purposes, and when he was gone, that label was copied by other employees at Powerline when he wasn't there and then put on batteries. With respect to thinners to take markings off batteries that were bought from other places, he says you couldn't do that. He says if you use a thinner on a battery, it would destroy the outside of the battery, and the battery would be worthless at that point. In terms of the traceability, Lisa Dinier admitted faxing all the documents regarding the traceability and the invoices. Over seven years, they say he's part and parcel of this huge fraud over seven years with over 80,000 batteries. There was about a dozen emails that the government introduced at trial, about a dozen emails over seven years. If he truly is in the middle of this huge government procurement fraud over seven years, there's going to be a lot more than a dozen emails. The handwriting on documents, he said that he did that when he got back in 2011. There was a huge bag of mail that had been unopened because the company was in disarray, and without knowing what had happened in the prior six months when he was out of town, he tried to get some invoices paid and bring some money into the company. The video of him touching the batteries that eventually went to the Navy ship, he says he didn't work in the warehouse. He wasn't involved with shipping, and he was there, and the batteries were there, but he didn't know where they were going, and he didn't know exactly what the batteries were. And so he dealt with all the points the government raised. He gave plausible, reasonable explanations as to why what the government said was inculpatory conduct, was not at all. And so he addressed the government's case head on, and something I've learned from 19 years of trial practice as well is if you have a defendant who testifies and gives a credible account, you have a decent chance to win that trial, and that's exactly what Mr. Denier did in this case. He testified. He gave a credible account as to why he didn't know. He addressed all the points the government had raised in its case, and when he was done, he had given a plausible, viable explanation as to why he wasn't guilty, and that's why these errors are harmful, not to mention the fact that they're egregious. It's unfair. Mr. Denier deserved a fair trial based upon the evidence the government could submit that he knew what was going on at the company, and it's just not fair for the government, for the prosecutor to testify against him, for the prosecutor to testify against him at trial. It's not fair to bring an exhibit to Terminal 3, and Your Honor is exactly right. It's three pages of criminal activity set forth in the book. If they're just talking about, if he's clairvoyant and he knows in 2004 that in 2011 he's going to go off to the Caribbean, then why not just address that point from the book? And Your Honor is exactly right about the agent settle issue. He can come to trial and testify all he wants that he didn't know, but if the government is able to show a confession from 2011, that's pretty much the end of it for Mr. Denier. He had the right to testify, but he never made those statements. He never confessed. I don't know why the agent didn't record the interview. He didn't. The agent said he made these inculpatory statements. All he wanted to say was, I never made those statements, and he had the right to say that. It was probably the most important point of the trial, and it was terribly unfair that he wasn't able to counter the agent settle's testimony with admissible statements that he never made those statements in the first place. Thank you, counsel. Thank you very much. The case discharge will be submitted.
judges: Reinhardt, Fernandez, Owens